CHARLOTTE C. CLUFF *vs.* MUTUAL BENEFIT LIFE INSURANCE COMPANY.

On the trial of an action upon a policy of insurance made payable to the plaintiff after due notice and proof of the death of the insured, the plaintiff, to show such notice and proof, called a witness who testified that he delivered to the insurers some affidavits, together with some cuttings from newspapers and letters between persons not parties to the action. All of these the insurers produced; and the plaintiff put the affidavits in evidence, but declined to put in evidence the cuttings or the letters, and the judge refused to require him to do so, or to permit the insurers to do so themselves. *Held,* that the refusal was not a valid ground of exception, unless it plainly appeared that the insurers were prejudiced thereby; and that they were not so prejudiced, if the fact of the death of the insured was sufficiently shown, whether the affidavits alone, or all the papers together, were considered as the proof thereof furnished to them by the plaintiff.

On the trial of an action on a policy of insurance upon the life of the insured, made on condition that it should be void if he should die in the known violation of any law, the record of the trial and acquittal by a court of competent jurisdiction of a person who killed the insured is incompetent to prove that the condition was broken.

In a policy of insurance, the fact that it was made by a mutual company with one of its members upon his life gives to words used for a definite purpose and applied to transactions of a clearly defined character, such as a provision that the policy shall be void if

the insured shall die in the known violation of any law, no significance different from what would be their fair construction in a similar contract between any parties.

On the trial of an action on a policy of insurance upon the life of the insured, made on condition that it should be void if he should die in the known violation of any law, evidence was introduced tending to show that he was killed while doing what would constitute either robbery or larceny unless he acted under a belief which would avoid the otherwise criminal character of his acts. *Held,* that instructions to the jury were erroneous which permitted them to understand that such a belief need not be a belief in his legal right to do the acts, but might be a belief in a right of self-redress by reason of the disturbed condition of the country, the inefficient administration of the laws, or otherwise. *Held, also,* on a new trial upon the same evidence, that the fact that the judge did not comply with a request to instruct the jury that the insured must be presumed to have known the civil law of the state where he was killed was not a valid ground of exception, if he did instruct them that the insured had no right to do the acts in the commission of which he was killed, and that he must be presumed to have known the criminal law of the state.

CONTRACT on a policy of insurance made by a mutual insurance company to the plaintiff's husband, Matthew J. Cluff, on his life, in the sum of $3000, payable to the plaintiff " within ninety days after due notice and proof of the death of the said Matthew," and containing a clause declaring the policy void in event that said Matthew " shall die " " in the known violation of any law of these states or of the United States," " or of any other country which he may be permitted under this policy to visit or reside in."

At the third trial in the superior court, before *Putnam,* J., after the decisions reported 13 Allen, 308–319, the plaintiff, to show notice and proof of the death of her husband to the defendants, called Thomas J. Alexander as a witness, who testified that he delivered to the defendants' agent affidavits of the plaintiff and himself and Francis Bugbee; which affidavits, being produced by the defendants on notice, were put in evidence, and in substance were as follows :

The affidavit of the plaintiff stated the age of her husband, and where he resided in 1854, when the policy was made; the places of his subsequent residence until 1859; and that in 1859 he removed to Massachusetts and resided here until on December 23, 1863, he started to go to New Orleans. The affidavit of Alexander set forth that he was well acquainted with Matthew J. Cluff, who lived at Waltham, and whom he knew to be the person on whose life the policy in question was issued; that said

Cluff left Boston on or about December 23, 1863, to take passage in the steamer Morning Star for New Orleans; that he saw Cluff in New York on December 26, when Cluff showed him his ticket for the passage, and said that he would leave by that steamer on the afternoon of that day; that he afterwards learned that Cluff did so sail; and that he entertained no doubt of his being the person named Cluff described in Bugbee's affidavit. The affidavit of Bugbee stated that he was a physician residing in the parish of Ascension in Louisiana; that he sailed from New York for New Orleans on December 26, 1863, on the steamer Morning Star, with Matthew J. Cluff as a fellow-passenger, and knew said Cluff well from said December to the time of his death, and had " been residing with him on the same plantation for some months up to the time of his death;" that on February 25, 1864, he and Cluff were together upon the bank of the Mississippi River, when Cluff was shot through the heart by William P. Cox, and died in a few minutes; that no coroner's inquest was held, the country being under military rule, but that he procured the attendance of the military officer of highest rank on duty in the neighborhood, (naming the officer,) who examined the body and delivered to him the effects thereon; that he took charge of the burial of the remains, and placed them in a tomb in New Orleans; and that the deceased, according to his own statements and those of others, was from Massachusetts.

Alexander further testified that, at the same time with these affidavits, he delivered to the defendants' agent two slips cut from newspapers published in New Orleans, and two letters written from New Orleans by one George W. Wilder and addressed here to a person (other than the plaintiff) who held a policy of insurance from the defendants on Cluff's life. The defendants produced these cuttings and letters, and requested the judge to require the plaintiff to read them to the jury; but the judge declined to do so. The defendants then offered, themselves, to read them to the jury, " on the ground that the same were part of the preliminary proof, and showed that no cause arose under the policy, and that the assured died in the known violation of law;" and they renewed this offer on opening their defence;

but the judge both times refused to allow them to be read. These cuttings and letters were produced at the argument in this court, and their substance, so far as it is material, is stated in the opinion.

Besides the evidence of notice and proof to the defendants, the plaintiff introduced the depositions of Bugbee, and of William Scott, a civil engineer, of the parish of St. Charles in Louisiana; and rested her case. The material parts of these depositions were as follows:

Bugbee, after testifying on direct examination to the fact of Cluff's death, testified, on cross-examination, that on February 25, 1864, at the Doyle plantation in the parish of Ascension, he and Cluff " were sitting on our horses on the levee, when William Cox, a boy" "from sixteen to eighteen years of age," " drove along with a load of water. Cluff asked me who that boy was. I told him that it was a Cox boy. He asked the boy when they were going to leave the place. The boy answered, ' they were going soon.' Cluff asked the boy when they were going to pay the bill. The boy answered ' they were not going to pay it all.' Cluff said, ' I will take your horse then.' The boy dared him to do it, and to try it then. Cluff then went unhitching the horse from the wagon. After having partly unhitched, he tried to get the reins or ropes from the boy. The boy then got down from the wagon, by the side of Cluff. Cluff then took a small penknife to cut the ropes. The boy said, ' Don't do that.' Cluff then got the ropes. The boy then ran about three rods, drew a pistol, fired at Cluff, and shot him in the right side between the fifth and sixth ribs. The boy then cocked his pistol again, but did not fire. Cluff said to me, ' He has hit me, doctor,' and never spoke afterwards, and died immediately." " Cluff was in the act of taking the horses from the wagon in which the boy who killed him was." " Cluff did not assault said boy otherwise than by unhitching his horses. He did not beat him, nor did he threaten him just before he was shot, only to the taking of his horses." " The bill Cluff talked of was a bill for feed for the horses and cattle of the Coxes, used by them from the plantation of which said Cluff was the lessee."

Scott, on direct examination, testified to the fact of Cluff's death; that he was present at the time; that when Bugbee told Cluff that Cox was the driver of the wagon, Cluff told Cox " to halt with his wagon," and that this was what ensued : " When Cox halted his wagon, Cluff asked him when he was going to move.   Cox said he had moved some of their things ; and then Cluff asked him when he was going to finish moving.  Cox said ' he did not know; when he got ready.'   Then Cluff asked him ' where he was moving to.'   Cox said, ' to Baton Rouge.'   Cluff then asked Cox ' when he was going to pay the bill that he sent in to him.'   Cox said ' he was not going to pay it all.'   Cluff then said, ' You are not going to pay it at all ? '   Cox said, ' No, sir, I am not.'   Cluff then said, ' You have got some stock, hain't you, some horses and cattle?'   Cox said, ' Yes.'   Cluff then said, ' Well, if you won't pay the bill, I will take your horses and cattle to pay it.'   Cox then said, ' You better get at it now.'   Cluff got off the levee, and went down on the road where Cox was, and unhitched both horses out of Cox's wagon, and then went up to the wagon and told Cox to turn loose the lines.   Cox said he would not do it.   Then Cluff pulled out a little penknife, about three inches long, and started to cut the lines of the wagon ; and Cox then told Cluff not to cut his lines.   Cluff then shut the knife up and put it in his vest pocket, and went up to the horses' heads, and started to untie the lines from the bridle.   By that time, Cox left the wagon and went up to the horses' heads where Cluff was, and then grabbed Cluff by the throat.   Cluff then struck Cox, and knocked him off from him, making Cox a sort of staggering on his all fours.   Then Cox ran off about three strides behind the wagon, and drew out his pistol and fired at Cluff.   Cluff then dodged round the horses' heads to keep himself from getting the second fire.   Cox tried to get the second fire at him, until he heard Cluff halloo out to the doctor, saying he was struck.   At this time Cox whirled and ran.   Cluff then fell.   The doctor ran to him, and found him dying."   And on cross-examination Scott testified that Cluff was about forty years old ; that he did not threaten Cox; nor was his conduct and anguage violent and threatening to-

wards Cox; nor, when he was shot, was he facing or approach-
ing Cox.

To both Bugbee and Scott the defendants addressed cross-
interrogatories, to which the plaintiff objected, as to whether
Cox was not tried for the homicide, and whether they did not
testify at the trial, and what was the result of it; and the judge
sustained the objection and excluded those portions of the depo-
sitions. He also excluded the record of the military court by
which Cox was tried and acquitted; which record the plaintiff
offered " to show the fact of said trial and acquittal, and the law
of the place of trial."

The defendants cited the Rev. Sts. of Louisiana, page 160,
Criminal Proceedings, § 1, which provide that " all crimes, of-
fences and misdemeanors shall be taken, intended and construed
according to and in conformity with the common law of Eng-
land;" and asked the judge to rule that Cluff " died in a known
violation of the law according to the terms of the policy," and
to direct a verdict for the defendants; but he refused to do so.

The defendants then requested the judge to instruct the jury
" that a claim made by Cluff of indebtedness of Cox for feed,
and that he would take his horses for it, was not such a claim,
however honestly made, as would change the nature of the for-
cible taking of the horses of Cox, so that such taking would not
be robbery or a known violation of law;" and " that a wrong-
ful taking of the horses of Cox by Cluff by force was a trespass
with force, and a criminal offence, and was continued as long as
the taking of the horses continued." " The judge declined so
to rule; but, among other things, instructed the jury that, to
avoid the policy on the ground that the insured died in known
violation of law, it must be shown that the insured died in con-
sequence of a voluntary criminal act committed by him, and
known by him at the time to be such, and not in consequence
of a mere trespass upon property; and that there was a legal
presumption that he knew the law. He then defined the offences
of robbery, larceny, and assault and battery, (to which no ex-
ception was taken,) and further instructed the jury that the tak-
ing of the horses from Cox, if done under an honest claim of

right, however ill-founded, would not constitute the crime of robbery or larceny; that there must be a felonious intent in the crimes of robbery and larceny; that if Cluff took the property with an honest belief that he had a claim of right, it was not larceny, nor was it robbery, though done with force and violence; that if Cluff committed an assault on Cox, and was shot while the assault continued, the plaintiff could not recover; but if that assault had entirely ceased, and, after it had ceased, Cox, through revenge, or to prevent the seizure of the horses, shot Cluff, and this was a new and independent event, and not a continuance of the original affray, then the condition of the policy was not avoided. But, in determining this question, the jury were to consider how far, if he did commit the assault, he could be considered as having desisted from it, while persisting in the act which occasioned the affray; that if Cluff in the first instance committed the assault, and the firing of the pistol was a part of the same continuous transaction, then the condition of the policy was violated. They were also to be satisfied that the death was caused by the criminal act, or resulted from it, so that, if the criminal act had not been committed, the death would not have taken place."

The jury returned a verdict for the plaintiff; and the defendants alleged exceptions, which were argued in November 1867.

*A. C. Bradley* (of New York) *& C. W. Loring,* for the defendants.

*H. C. Hutchins & A. S. Wheeler,* for the plaintiff.

WELLS, J. One question in issue at the trial was, whether the plaintiff had, ninety days prior to the institution of the suit, furnished to the defendants sufficient proof of the death of Matthew J. Cluff, whose life was insured, as required by the terms of the policy. To maintain that issue on her part, the plaintiff put in certain affidavits by which that proof had been made, and which were produced in court by the defendants upon notice. The defendants also produced certain extracts from newspapers, and letters between persons not parties to this suit, which had been handed to the officers of the company at the same time with the affidavits, and constituted, as was contended, a part of

the evidence furnished by the plaintiff to satisfy them of the death of Cluff. These accompanying papers the defendants' counsel claimed to have read to the jury, as a part of the preliminary proofs.

It certainly cannot be maintained that these papers would have been competent evidence upon the main issue; and that position has not been insisted upon. But if they formed a part of the preliminary proofs, and were furnished to the defendant as such, the plaintiff had no right to prove this branch of her case by using a part only of the means by which she had sought to make out that preliminary proof. It does not appear upon what ground the judge who presided at the trial excluded these papers. Perhaps we might reasonably infer that he did so upon evidence from which he was satisfied that in fact they formed no part of what was intended and received as preliminary proof of the death. But the defendants' claim was otherwise; and the evidence reported indicates that they were furnished to aid or corroborate the other proofs. It would seem, therefore, that the exclusion was on the ground that the papers were not competent evidence upon the main issue; overlooking the issue which was raised by the denial of the alleged preliminary proof of death. But, however that may be, we are satisfied that the exclusion of the papers could not occasion any such injury to the defendants as to require that the exception for that cause should prevail. The papers were clearly inadmissible upon the principal issue. Upon the question as to the sufficiency of the preliminary proof, there can be no doubt that the fact of death was sufficiently shown, whether the affidavits alone or all the papers together are to be regarded as constituting that proof. The contract requires " due notice and proof of the death." It does not require the facts and circumstances attending the death to be set forth in the proofs. In this respect, as well as in the fact that the statements are not sworn to and do not even purport to be made by the plaintiff herself, the case differs essentially from that of *Campbell* v. *Charter Oak Insurance Co.* 10 Allen, 213. When an apparent ground of defence is disclosed by a separate and unnecessary narration of circum-

stances, and the proofs required by the policy are complete without that narration and disclosure, it cannot be said that the party has failed to comply with the condition imposed upon his right to litigate his claim; and the effect of such disclosure to defeat the action must depend upon the degree to which the plaintiff is bound by the statement. If not sworn to by the plaintiff, nor treated by him in such manner that he is concluded by his conduct, the whole question will be open to explanation and proof upon the main issue, subject to the usual rules of evidence. We cannot see that the plaintiff was in any respect concluded, or the defendants misled, by the account of the transactions connected with Cluff's death which was contained in the papers that were excluded at the trial; nor that the defendants have been deprived of any benefit which could have been properly derived from their admission.

The answers to cross-interrogatories relative to the trial of Cox were properly excluded, and that exception is not urged here.

The record of the provost court, showing the acquittal of Cox, was not competent for this defence. There is no privity of parties, nor identity of issues. The acquittal of Cox could not establish the fact that Cluff was guilty of a crime; but only that the offence of Cox was excused by the circumstances of provocation. Cluff's conduct was incidentally involved. It was not the subject of the judgment that was rendered. The law applicable to the conduct of Cluff, as it would affect him, could not be judicially determined in the trial of Cox.

The remaining exceptions relate to the proper application of the law, as determined at the former hearing in this case, to the testimony showing the circumstances of Cluff's death. In this connection we are asked to revise that decision, in consideration of the fact that this policy is a contract between a mutual company and one of its members. But we cannot think that that circumstance should modify the construction which has been given to the terms of this contract. The relations of the parties are always to be considered in seeking the true interpretation of their language. But their words, used for a definite

purpose and applied to a transaction of a well understood character, must be held to convey the meaning and force which is ordinarily attached to them. We see no reason to give the words of this contract any significance different from what would be their fair construction between any parties.

Among the points already decided are : 1st. That "violation of law," as used in this policy, means crime; and "known violation of law" indicates a voluntary criminal act. 2d. That offences against the person or property of another, such as are recognized and treated as crimes by the common law, and the laws of civilized countries generally, will be presumed to be crimes in Louisiana. 3d. That the burden of proving that the insured died in the known violation of law is upon the defendants. 4th. That Cluff must be presumed to know the criminal laws of the government under the jurisdiction of which he was.

The testimony in regard to the circumstances under which Cluff met his death tended to show that he was engaged in the commission of acts which would constitute either robbery or larceny, unless he acted under a belief that he had some legal right by which his conduct would be justified. Whether the two depositions, from which the whole testimony upon the subject was derived, furnished evidence that he acted under such a belief, seems to have been a point of contest. There was no evidence of any title or claim of title; nor any direct evidence of the existence of a right of lien. The depositions show that Cluff made the claim of a debt due him from the owner of the horses; and that he declared his purpose to take the horses to pay it. Neither deposition states that Cluff, in words, set up any right of lien, or other legal right to hold or to take the property of Cox. But the deposition of Bugbee indicates, inferentially, that Cluff might have supposed that the horses could legally be held as security for his debt, inasmuch as it was claimed to have arisen from the keeping or feed of the stock upon the plantation of which Cluff was lessee.

The instructions upon this point were undoubtedly intended to correspond with the opinion given by this court upon the

exceptions taken at the last previous trial. They do so to the extent of adopting in part the language of the opinion, t. wit, that the "taking of the horses from Cox, if done under an honest claim of right, however ill-founded, would not constitute the crime of robbery or larceny." But, in the opinion, that proposition is followed, in the next clause of the same sentence, by the explanation which limits the "claim of right" intended to one whereby the party sincerely "believes that he is legally justified in taking property;" whereas the instructions contain no qualification nor suggestion limiting it to the claim of a legal right. This might not be important, if we were able to see, or could properly assume, that these instructions were applied only to that suggestion of a claim of right by way of lien which is founded upon the deposition of Bugbee, namely, the right to hold the stock as security for what was due Cluff from the owner, on account of his previous occupation of the plantation of which Cluff had a lease. Such a claim would be of a legal right, if the jury should find that it was in fact made. But the evidence that Cluff claimed or that he believed he had such a right was very slight. The defendant's counsel contended that the evidence showed no claim to have been made by Cluff, except of a debt against the owner of the horses; and that he avowed his purpose to seize the horses by way of self-redress. In this view of the evidence, he asked for the following instruction, namely, "That a claim made by Cluff of indebtedness of Cox for feed, and that he would take his horses for it, was not such a claim, however honestly made, as would change the nature of the forcible taking of the horses of Cox, so that such taking would not be robbery or a known violation of law." This position of fact was so far warranted by the state of the evidence as to entitle the party to instructions, not perhaps in the form as requested, but such as would be adapted to the case if the jury hould find the facts to be as the defendants assumed. Applying the instruction given, as reported, to this view of the facts, it seems clear that too great latitude was allowed for the jury to take into account any loose opinions of right which they might suppose Cluff to have formed. It would seem to permit

a mere opinion or theory of abstract right, which the jury might think Cluff had come to entertain honestly, and chose to act upon regardless of positive law, to exempt him from criminal responsibility. A claim of right which can have this effect must be a claim of legal right. It is not enough that it be asserted. There must be a real and not a pretended belief that such legal right exists. It involves more than a belief in the right to disregard law for the purpose of self-redress.

We are not informed upon what theory the counsel of the plaintiff would contend that Cluff acted under an honest claim of right, assuming the facts to be as the defendants present them ; nor does it appear that the plaintiff insisted, at the trial, that there would be any pretence of legal justification upon that assumption. But the instructions do not point to any particular claim of right. They are applicable to the defendants' view of the evidence as well as to that of the plaintiff. They should therefore leave no doubt in the minds of the jurors that nothing less than a claim of a legal right, or an authority of law, was intended; especially if the attention of the court was called to the defendants' view of the evidence, in connection with this instruction. A majority of the court are of opinion that it appears from the exceptions that the attention of the presiding judge was so directed; and that the instructions given were not sufficiently explicit and qualified in the respects already considered.

The plaintiff insists, however, that this whole subject was brought under discussion by the exceptions taken at the last previous trial, and fully and conclusively determined by the decision then made, so that no question is now open upon this part of the case. We have indicated the points in which the instructions given at the last trial fail to conform to the real purport of the opinion by which the former decision was announced. It may be observed also, that the instructions which were then brought up for our revision differ from the present, in that the claim of right which was then held to disprove felonious intent was confined to the case of a " belief that he had a legal right" to take the property. As thus qualified, and applied to the case

then presented upon the exceptions, this court did affirm the instruction. It is true that the defendants' counsel did discuss, at that time, some of the points now considered. But the plaintiff's counsel contended, as appears from the brief submitted by them, that no such question was open upon the exceptions, inasmuch as the defendants' prayers in relation thereto all involved conclusions of fact; and the court were inclined to the same view.

The burden is upon the defendants, as has been already decided, to satisfy the jury that the act of Cluff which occasioned his death was a voluntary criminal act. This requires the defendants to overcome any inference, which may be drawn from the testimony, that in attempting to take the horses he acted under an honest belief that he had some legal right or authority which entitled him to take them. But if the defendants should be able to satisfy the jury that Cluff had no color of title or right in or to the property, nor of legal authority to take it; and that he made no claim of any such title or right, nor of any authority, except that, having a debt against the owner of the horses, he claimed a right to seize his property in payment, by way of self-redress without regard to law, we think the defendants would then be entitled to a verdict. Such a claim would be a claim of the privilege to commit a crime, which the law will not recognize to be honestly made as a claim of right.

We regret that it should be necessary to remit the case for a third time to a jury; but it is of more importance that exact justice should be administered than that the litigation should be closed at any particular stage. As the case was left by the last trial, it would appear that the verdict may have been rendered for the plaintiff, although the jury were satisfied that Cluff had no pretence of any title, lien or other right, nor of any legal authority, merely because they supposed that he might have entertained an honest belief or opinion that in consequence of the state of the country and the want of efficient administration of the laws, he had a good right, from necessity or otherwise, to take redress into his own hands without regard to law. Such is not the result of our decision upon the former occasion, and such

was not, as we understood the case, the fair interpretation of the instructions then brought up for our decision.

In accordance with these views it will be necessary that a new trial should be had. *Exceptions sustained.*

At the fourth trial, before *Ames,* C. J., no question was made as to the notice and preliminary proof of the death of the insured; and the evidence produced by the plaintiff in support of her claim was the same as was offered at the former trials, with some additional citations from the laws of Louisiana.

The defendants requested the judge to adopt, in instructing the jury, the following propositions : " That by the laws of Louisiana, as well as by the common law, Cluff had no right of lien or privilege on or to the horses, or either of them, in the possession of Cox, even if it had been shown that the horses, or either of them, had eaten feed belonging to Cluff; that every person must be presumed to know the civil equally as the criminal law of the government under the jurisdiction of which he is found; that Cluff must be presumed to have known that he was not legally justified by the laws of Louisiana in taking the property in question, unless there be evidence that he did in point of fact believe that the actual laws of Louisiana authorized him to do what and as he did in the seizure ; that the threat to seize Cox's horses for the debt, whether real or pretended, was, unless a seizure by due process of law was thereby intended, a threat to do an act illegal by the laws of Louisiana ; that a threat to do an act illegal by the laws of Louisiana is not of itself evidence on which a jury may infer that the person making such threat believed the act in point of fact legal by those laws ; that the seizure of the horses in the manner described was illegal by those laws, and the fact of doing an act illegal by those laws is not in itself evidence from which a jury may infer that the party doing it in fact believed the seizure actually legal under those laws ; that it is not enough that the jury supposed that Cluff might possibly have thought that he had a right to seize the horses in the way he did, but the jury must themselves believe as a real fact that Cluff believed as a real fact that he had a

right by the actual law of Louisiana to seize the property as **he** then and there seized it; that Cluff having in fact no right under the laws of Louisiana to seize the property in the way he did, the belief that he had such right is an affirmative fact to be proved by the plaintiff, and, in the absence of such proof, he must be deemed not to have believed it; and that the jury, in the absence of any law giving a lien or privilege for feed, are not warranted in finding, if the plaintiff's evidence is merely to the extent that the owner of the horses owed a bill for feed to Cluff, that Cluff believed he had a legal right to take the horses for it."

The judge did not adopt the instructions thus requested; but did instruct the jury substantially " that, the execution of the policy, the notice and preliminary proofs, and the fact of Cluff's death in Louisiana being admitted, the only question was, whether the circumstances of his death were such as within the terms of the proviso in the policy to exonerate the defendants from paying the amount of the policy; that the burden of proof was on the defendants to show that Cluff died in the known violation of the laws of Louisiana, that is, in doing some voluntary criminal act; that offences against the person or property of another, recognized and treated as crimes by the common law, and the laws of civilized countries generally, are to be presumed to be crimes by the laws of Louisiana; and that Cluff must be presumed to have known the criminal law of that state; that the question then would be, whether he was engaged in doing a criminal act at the time; that it was conceded that he was trying to get possession of the horses without the consent and against the will of the person having them in charge; that what he was trying to do might be robbery, or larceny, or an act which might not have proceeded from a criminal intent; that to make it out robbery or larceny, (and it was immaterial which, if it was either,) it must appear that he was taking the property, with a felonious intent, without the consent and against the will of the person having it in charge; that it was clear on the facts that he had no right to take it, and the mere fact that he was a creditor would not give him a right to help himself to the prop-

erty of his debtor; that there was no evidence that by the laws of Louisiana he had any lien on the property; but that the defendants were bound to prove that it was not only a wrongful, but also a criminal act; and that if Cluff had not lost his life in the attempt, and had accomplished his object, and had been indicted for robbery or larceny, he would be entitled to an acquittal, if it appeared that he acted under an honest belief that he had a legal right to take the property, however ill-founded that belief should prove to be." And he further instructed them as follows: " Had he such a belief, that is, a real and not a pretended belief, that he had authority by law so to do? A mere opinion or theory of abstract right, regardless of law, would not be a justification. A mere loose opinion that it would be just and right, independently of and without regard to law, to take the property, would not be such a belief. In judging of the existence of such a belief, the jury would have a right to consider what reasons and grounds of belief he had. If he had no right to take the property, and no show or color of such a right, and no reason to suppose he had such a right; or if he ought to have known better, and the jury think he did know better than to suppose he had such a legal right; then by the terms of the proviso the defendants are entitled to a verdict. If the defendants overcome any inference that may be drawn from the testimony that in attempting to take the property Cluff acted under an honest belief that he had some legal right to take it; if they satisfy the jury that he had no color of title or right in or to the property, nor of legal authority to take it; and that he made no claim of any such title or right, or of any authority, except that, having a debt against the owner, he claimed a right to seize the property in payment by way of self-redress without regard to law, the defendants would be entitled to the verdict. Such a claim would be a claim of the privilege to commit a crime, which the law will not recognize to be honestly made as a claim of right. A claim to self-redress on the ground of the unsettled state of the country, and any supposed difficulty of getting legal redress, would not be such a claim of right as the law woulc recognize as furnishing a legal excuse for an act in other respects unlawful."

The jury again found for the plaintiff; and the defendants alleged exceptions, which were argued on March 21, 1868, by the same counsel.

CHAPMAN, C. J. This case is now before us for the fourth time upon the same evidence as to the circumstances under which Cluff came by his death.

The learned judge who presided at the first trial ruled that upon the evidence the defendants were liable as matter of law; but the testimony of the two witnesses which is reported differs materially as to the particulars of the transaction, the statements of one of them tending to prove that Cluff came by his death in the known violation of criminal law, and the statements of the other tending to show that he was not thus killed. The court held that it should have been left to the jury to decide, under proper instructions, how he came by his death.

Upon a second trial, the case was submitted to the jury; but, exceptions having been taken to the instructions, it was held that they were inaccurate in one particular; and it was indicated pretty fully in the opinion what the instructions should be.

On the fourth trial the rulings were in substantial conformity with this indication. The defendants presented at the trial, and requested the court to adopt, in instructing the jury, several legal propositions. They were not adopted in form; but were substantially adopted, with a single exception. Among them was the proposition that Cluff must be presumed to have known the civil law of Louisiana. This was not adopted. But, the judge having stated to the jury that Cluff had no right to take the property, the material question to be submitted to them on this point was, whether he took it with a felonious intent, and not whether he took it with a knowledge that he was violating the civil law of the state. As to the felonious intent, the instruction given was, that he must be presumed to have known the criminal law of Louisiana, and we think this was sufficient, because it includes all that he is presumed to have known respecting his civil rights, so far as such knowledge affects criminal intent. Beyond this, the judge was not bound to go. If he had given the instruction requested, it would have been necessary to ex-

plain its bearing on the case, in order to prevent the jury from being misled by it into the belief that they must find for the defendants if they should believe that Cluff knew he was acting in violation of the civil rights of the person who killed him. It was within the discretion of the judge to state the general proposition which covered the whole subject, and omit the more particular statement of a subordinate proposition that would require explanation in order to guard the jury against being misled by it. *Exceptions overruled.*