## CHARLESTON.

JESSIE C. MARTIN *v.* MUTUAL LIFE INSURANCE COMPANY OF NEW YORK

(No. 6232)

Submitted November 20, 1928. Decided December 11, 1928.

*Frederick L. Allen, Robinson & Robinson* and *Brown, Jackson & Knight,* for plaintiff in error.

*M. M. Neely,* for defendant in error.

LIVELY, PRESIDENT:

The defendant, Mutual Life Insurance Company of New York, was awarded this writ to a $1,058.83 judgment obtained by Jessie C. Martin in a suit on a life insurance policy.

The policy in question, issued on August 17, 1923, to the plaintiff's husband, Benjamin H. Martin, provided for payment of $1,000.00 to the insured's wife upon due proof of his death; or in the event such death occurred directly and solely through external, violent and accidental means, double that amount was to be paid, unless the death resulted from certain excepted causes (including a violation of law by the insured).

On May 26, 1925, Martin was shot and killed by Earl H. Brannon. The defendant company admitted partial liability, but because of its refusal to pay the double indemnity, the instant suit was instituted. On the trial, the defendant company tendered the face amount of the policy to the plaintiff, which was accepted by her, thus leaving the liability for double indemnity as the only issue to be determined. The defendant company by special pleas and statement of defense, to which replication was made and issue joined, contended that it was not liable for double indemnity, first, be-

cause the death of the insured was not accidental, he having been killed in self-defense by one Earl H. Brannon, and second, because the death of the insured resulted from a violation of law, in that "he voluntarily engaged in an affray with and assaulted one Earl H. Brannon, * * * and did unlawfully enter the office of said Earl H. Brannon without his consent, * * * and did unlawfully curse, insult, annoy and threaten the life of said Earl H. Brannon," as a direct result of which the insured was killed by Brannon. The case was submitted to the jury on instructions covering the issues thus made up, with the result hereinbefore indicated.

The basic question presented on this writ is whether the evidence sustains the verdict of the jury that Martin's death was a result of an accident within the meaning of the policy, and was not the result of a violation of law. This necessitates a detailing of the evidence somewhat at length.

It appears from the evidence that for a number of years Earl H. Brannon and the insured, Benjamin H. Martin, had lived in the little town of Bridgeport, West Virginia. Brannon was one of the town's physicians, and Martin was its druggist. The latter's drug store was on the same side of the street from Brannon's office and about three hundred feet west therefrom. The two men had been good friends until about a year or more before the fatal shooting, when, according to Brannon, they quarreled over the purchase of a share of stock in a local gas company. As time went on the relations between the former friends grew more strained, although Brannon continued, on rare occasions, to patronize Martin's drug store for needed medicines. The feeling between them was further heightened, when, according to Brannon, about ten months before Martin was killed, the latter entered his office with a pistol in his hand and demanded that the former furnish him information relative to a story alleged to have been circulated about Martin's wife. His explanation of what he knew concerning the rumor was unsatisfactory, and Martin angrily withdrew from the office.

Later, in the fall of 1924, at a high school football game in Bridgeport, between playing periods, Martin accosted Brannon, and, according to the latter, cursed him and threatened

his life. In January, 1925, Doctor Brannon having ordered certain medicines from a wholesale house, received them through Martin's drug store. Martin told him that such a practice must stop. Brannon tried to explain, but his explanation was unsatisfactory. Martin became very angry, and, according to Doctor Brannon, again threatened to cause him trouble. In the meantime, other persons had communicated to Doctor Brannon threats made against his life by Martin. Finally, about a week before the fatal shooting, Brannon and his wife drove to Hinkle Lake, not very far from Bridgeport. While Mrs. Brannon was visiting at a home near the lake, Martin drove up and approached Brannon, who was standing by the dam. The lake had been drained and was slowly filling up. Martin said: (according to Doctor Brannon) "You don't have to be interested in that lake; long before this fills up you are going where there are no lakes." Mrs. Brannon observed the trouble between the two men and came running down, whereupon Martin walked off and said nothing more.

This brings the evidence down to the day of the fatal shooting. On that day, about three o'clock in the afternoon, a cosmetic salesman engaged in selling Martin a bill of goods, noticed that he appeared to be growing very nervous, pacing up and down the floor. The witness testified that finally Martin abruptly broke off negotiations, and said that that was all he had to order; that he had "some messing up" to do. Another witness testified that while passing through Bridgeport that afternoon he inquired of Martin as to Brannon's whereabouts, to which inquiry Martin replied: "I am looking for the son-of-a-bitch myself, and if I get him cornered I am going to kill the son-of-a-bitch."

Between three and four o'clock in the afternoon on the day of the shooting, Brannon left his office to go to a nearby restaurant; from there he went into a pool room adjoining the restaurant and engaged in two games of pool. Martin came into the pool room, sat down within eight feet of where Brannon was playing and watched the game intently, getting up from time to time and then returning to resume his vigil. After a half hour or more of play, Doctor Brannon put up his cue stick and went to his office to obtain medicine for a Mrs.

Sutton, whose boy had been waiting for him. (It was then about five o'clock in the afternoon.) As Brannon passed Martin on the outside of the pool room, the latter, according to Brannon, directed a menacing look towards him and said, "I am going to get you."

After Doctor Brannon had gone to his office, consisting of a one-story frame building divided into two rooms, front and rear, Martin came in. He said nothing, but went over and leaned against the wall of the front office until the Sutton boy had gone. This left Brannon and Martin as the only occupants of the office, and, according to the latter, Martin then said: "This town is entirely too small for me and you both. I have been here a long time before you were, and I am going to be here a long time after you are gone. I gave you fair warning to get out of this town along in March, and you have not gone. You are not going?" To which Brannon replied, "No, I am not going Martin, and I advise you to go up to your drug store and look after it." Martin then started towards the door, reached it, slammed it shut and said, "I am going to send you on a little trip to hell;" whereupon Brannon jumped into his rear office and closed the door. He could hear Martin walking up and down in the other room. In the meantime, Brannon went to his desk, removed therefrom a 25-caliber automatic pistol, and held it in his right-hand down by his side. After he had done so, Martin slowly opened the door between the two offices, finally throwing it wide open. He then leaped into the back office with his hand in his right-hand pocket; came towards Brannon and said, "Now, you dirty son-of-a-bitch, I am going to kill you." Brannon then testifies: "I waited until he got close to me and I was watching his hand in his pocket; I did not want to fire unless I had to, and just as he went to draw the gun from his pocket, I quickly jumped to the side and fired." The pistol had been held about a foot from Martin's right ear when he was killed. The wounded man pitched forward on his face and fell in the doorway between the two rooms. There was a considerable hemorrhage caused by the wound in the ear, and Doctor Brannon drew the body back into the inner office so that he could have the benefit of the

light, and tried to arrest the hemorrhage; but ceased his efforts when an examination revealed that Martin was dead. He then mopped the blood out of the doorway between the two offices and from the floor of the front office, picked up the pieces of a bottle which had crashed from a shelf when Martin fell, and threw them into a creek behind his office. About six o'clock that evening, several witnesses state that they accosted Dr. Brannon as he was carrying the broken bottle to the creek, and he told them that a bottle had exploded in his office. There is also evidence that about this time he went to the nearby restaurant and made the same remark about a bottle having exploded in his office. Doctor Brannon testifies that after having disposed of the bottle, he went to his home, stayed there for a minute, and then proceeded direct to Clarksburg to see the prosecuting attorney. Before his departure he locked the door to his outer office and the door between the two offices. Mr. Will Morris, the prosecuting attorney, had been an old friend of the Doctor, and the latter went to him for the purpose of telling about the whole affair, in the belief that after the circumstances had been explained, ''that would be all there was to it.'' He was unable to get in touch with Mr. Morris, and returned to Bridgeport. Brannon is corroborated by witnesses who testified that he was in Clarksburg that evening looking for the prosecuting attorney. Upon his return to Bridgeport, Brannon, according to his story, went to his home, stayed there a short time and then came down town with the intention of telling Seese, a justice of the peace, about the killing, and with that plan in mind he returned to his office. There was a preaching service being held opposite Brannon's office building, and a considerable crowd was in attendance there. It was now about seven o'clock in the evening. Brannon saw Seese, according to his testimony, beckoned to him and then went into his own office to wait. Seese did not come, and he began to beckon to him again. About this time, Mrs. Martin who had become alarmed over the absence of her husband and had been in search of him, approached Doctor Brannon and inquired as to her husband's whereabouts. Doctor Brannon told her he had seen Mr. Martin talking to a pipe sales-

man that afternoon. Noticing the agitated appearance of the Doctor, Mrs. Martin said she wanted to look into his inner office, but he refused to permit her to enter. However, upon her threat to call Seese, Brannon opened the door to that office, and Mrs. Martin seeing her husband lying in a pool of blood upon the floor, screamed. Attracted by her outcry, Mr. Seese, Mr. Kester, Mrs. Martin's father, who had been assisting in the search for Martin, and one or two others, rushed into the office, closely followed by the crowd which had been listening to the preaching across the street. Just prior to Mrs. Martin's arrival, Doctor Brannon had stated to Mr. Kester and to one or two others who had inquired as to Martin's whereabouts, that he had seen Martin talking to a pipe salesman that afternoon. At the time of the finding of Martin's body as detailed, Brannon admitted that he had killed Martin, but averred that he had done so in self-defense. An examination of the body revealed a gun-shot wound in the right ear, a mashed nose, a cut lip, a bruise over the right eye and an abrasion upon Martin's chest. It was the opinion of the coroner that death had been caused by the gun-shot wound and resultant hemorrhage, and that the other wounds were post-mortem. A search of deceased's clothing failed to reveal the presence of any weapons. It may also be well to note that Martin was a man about five feet eight inches in stature and of a very powerful build, weighing about 180 pounds; Brannon was somewhat less in height and weighed about 160 pounds. The difference in the ages of the two men was not great. These were substantially all of the material facts as presented on the trial of the case.

In an action upon a policy insuring against death resulting solely from external, violent and accidental means, the burden rests upon the plaintiff, in the first instance, to make out a *prima facie* case showing that the death resulted solely from external, violent and accidental means. 1 C. J., section 284, p. 496; 5 Joyce on Insurance (2nd ed.), sec. 3791, p. 6212; Vol. 6, Cooley's Briefs on Insurance (2nd ed.), p. 5283. But when a plaintiff has made such *prima facie* case, the burden is then upon the insurer to establish a defense showing that the death was within an exception of the policy.

*Nalty* v. *Federal Casualty Co.*, 245 Ill. App. 180; 14 R. C. L., sec. 599, p. 1437; 5 Joyce on Insurance (2nd ed.), section 3791, p. 6212; 1 C. J. p. 497, section 288; *Eminent Household of Columbian Woodmen* v. *Howle*, 198 S. W. (Ark.), 286; *Cluff* v. *Mutual Benefit Life Insurance Company*, 99 Mass. 317, 329. And where it is apparent that the death of the insured resulted from external, and violent means, and the issue is as to whether it was due to an accident within the meaning of the policy, or to some excepted cause, the presumption is in favor of accident and against the existence of facts bringing the case within any of the exceptions contained in the policy. 1 C. J., p. 495, section 278; *Jones* v. *U. S. Mut. Acc. Assn.*, 61 N. W. (Iowa) 485, 487.

The plaintiff made out a *prima facie* case when she introduced proof establishing the death of Martin by external and violent means. 1 C. J., p. 495, sec. 278; *Fidelity & Casualty Co.* v. *Weise*, 80 Ill. App. 499; *Whitlatch* v. *Fidelity & Casualty Co.*, 24 N. Y. Supp. 537; note on page 919, Vol. 9, Ann. Cas.; *Nerrow* v. *Pac. Mut. L. Ins. Co.*, 294 S. W. (Mo.) 97. The proof of death by such means raised a presumption that the insured's death was accidental, and this presumption was not destroyed by the fact that her evidence showed that Martin was "killed" by Doctor Brannon. *Gilkey* v. *Sovereign Camp of Woodmen of the World*, 178 S. W. (Mo.) 875, 877. It then became incumbent upon the defendant insurance company to meet this *prima facie* case by affirmatively showing that the deceased came to his death as a result of a violation of law. *Sovereign Camp of Woodmen of the World* v. *Jackson*, 138 S. W. (Tex.) 1137; *Gilkey* v. *Sovereign Camp of Woodmen of the World, supra;* 14 R. C. L., sec. 599, p. 1437; *Fidelity & Casualty Co.* v. *Weise, supra;* and authorities cited *supra*. Can it be said as a matter of law that under the evidence introduced in this case the defendant insurance company has carried that burden?

Two tests have been laid down for determining when the death of an insured shall be deemed to have resulted from a violation of law in an altercation to which he has been a party. As was said in Vol. 6 (2nd ed.), Cooley's Briefs on Insurance, page 5212: "There seems to be no question as

to the rule that where the insured commits a direct and aggravated assault, or in the progress of an altercation so conducts himself as to justify his adversary in taking his life in self-defense, or under such circumstances as to render the killing justifiable homicide, there is a violation of law on the part of the insured within the exception." The learned author continues: "On the other hand, if the insured is guilty of no more than a simple assault or is fighting in self-defense, or, having engaged in a fight, has withdrawn and retreated, not for the purpose of getting vantage ground, but with the intent to retire from the struggle, so that it is not justifiable homicide for the adversary to kill him, the death of the insured is not within the exception." See note, 13 L. R. A. (N. S.) page 262. A number of decisions, however, support the rule laid down in *Murray* v. *New York Life Insurance Company,* 96 N. Y. 614, 48 Am. Rep. 658, 660, wherein it was said: "Another case a little further removed from the violation of law as its cause would be one where a party assailed, in the heat of passion, naturally engendered by the act of the insured, on the moment takes the life of the aggressor, although the provocation might not be a legal justification of the homicide. Such a death we conceive might be within the condition, depending upon circumstances. If the violation of law in which the deceased was engaged was trivial although calculated to some extent to excite opposition or resistance, but the taking of life was a result which no reasonable man could have contemplated as likely to follow the unlawful act, there would be no such relation between the act and the death that the former could be said to be the cause of the latter. But if on the other hand, the party killed was engaged in committing a violent assault, the natural result of which would be to arouse the passions and excite the anger of the party assailed and in the heat of passion he killed his assailant, the death would, we think, be the result of unlawful act within the meaning of the policy, although the party causing it exceeded the bounds of lawful resistance. As between the company and the assured his violation of law ought justly to be treated as the cause of the death, because the deceased must be assumed to have known the danger he in-

curred, and that a party resisting an assault under such circumstances, and whose anger is naturally excited, does not mark with exactness the line which separates lawful defense from excessive and unjustifiable force."

We do not believe that under either of these rules the evidence in the instant case can be said to compel a verdict that the insured's death resulted proximately from a violation of law by him. Of course, if the evidence of Brannon must be accepted as true because it was not contradicted by direct evidence, then the jury would not be warranted in finding for the plaintiff. On the other hand, if the jury is not bound by the evidence of Brannon, it would be justified in finding that the insured came to his death as a result of an accident, in so far as he was concerned, even though it may have believed that he was engaged in an altercation with Brannon. *Tabor* v. *Commercial Casualty Company,* 104 W. Va. 162, 139 S. E. 656; and this result would be warranted, though it may have believed Martin committed a simple assault upon Brannon, or cursed him and refused to leave his office, as such a violation of law could not be said to have been the proximate cause of his death. *Murray* v. *N. Y. Life Ins. Co., supra;* Vol. 6 (2nd ed.), Cooley's Briefs on Insurance, pp. 5215-5217. It is true that Brannon's evidence was uncontradicted by direct testimony, and that it was corroborated to a certain extent by other witnesses. But there were facts and circumstances which militated against his testimony. The jury had a right to believe that his conduct after he had killed Martin was not consistent with that of a person who had slain another in self-defense. His concealment of the crime, by leading others to believe that a bottle had exploded, thus accounting for any sound that may have emanated from his office; his locking of the office doors and leaving the scene of the killing; his statement after the shooting when inquiries were made of him as to Martin's whereabouts, that he had seen Martin that afternoon talking to a pipe salesman; his refusal to permit Mrs. Martin to enter his inner office; his mopping up of the blood in the doorway between the two offices and from the floor of the front office; the fact that no weapons were found upon Martin's body; all are circumstances which cast doubt upon

his version of the affair. It is true that he attempts to explain his conduct in leaving the scene of the killing by saying that he went to see the prosecuting attorney at Clarksburg, but his good faith in that regard is not entirely free from doubt. All of these facts and circumstances taken together were such as to justify the jury in refusing to accept his evidence as true. *Payne* v. *Union Life Guards*, 99 N. W. (Mich.), 376. A witness may be contradicted or discredited by circumstances as well as by the statements of other witnesses, and even though there be no direct testimony contradicting a witness, a jury is not bound to accept his evidence as true if it contains manifest improbabilities, or if there are reasonable grounds for concluding that it is false. Jones Commentaries on Evidence, Vol. 6 (2nd ed.), section 2469, p. 4890; *Davis* v. *Judson*, 113 Pac. (Cal.) 147.. "Furthermore, in determining credibility the jury may, of course, give just consideration to the bias, the relationship, the character and the interest of the witness or to the fact that he is a party, or any other fact which may affect his credit. It is said that the testimony of a witness should be regarded in the light of his interest in the cause. So, also, his social and business relations with the party, his intimacy or hostility, and such other circumstances as might create bias may properly be considered." Jones Commentaries on Evidence, Vol. 6, section 2470, p. 4890.

We cannot say, as a matter of law, that the jury was unwarranted in finding that Martin came to his death solely as a result of external, violent and accidental means within the terms of the policy, and not as a result of a violation of law on his part. It was a matter concerning which reasonable men might differ, as is evidenced by the fact (which was admitted in evidence without objection) that when Brannon was tried for the killing of Martin, with practically the same evidence before it, one jury failed to agree, a second found him guilty of second degree murder, and a third acquitted him.

The judgment of the lower court will be affirmed.

*Affirmed.*