FRITZ COLLINS *v.* WOODMEN OF THE WORLD LIFE INSURANCE SOCIETY

(No. 9242)

Submitted February 24, 1942. Decided March 24, 1942.

Lovins, Judge, dissenting.

*John R. Pendleton,* for plaintiff in error.
*Walter G. Burton* and *Sanders & Day,* for defendant in error.

Riley, Judge:

Fritz Collins instituted this action in the Circuit Court of Mercer County against Woodmen of the World Life Insurance Society, a fraternal benefit corporation, to recover the double indemnity benefit of one thousand dollars provided in a certificate of insurance issued by the defendant on the life of her husband, Thomas D. Collins. Defendant prosecutes this writ of error to a judgment in plaintiff's favor based upon a jury verdict.

The policy recites that the defendant is a fraternal benefit society incorporated under the laws of Nebraska. A supplementary agreement to the policy provides for payment of double indemnity benefit upon proof that "the death of the member occurred in consequence of bodily injury effected solely through external, violent and accidental means, of which, * * * there is a visible contusion or wound on the exterior of the body, and that such death occurred * * * as the direct result thereof, independently of all other causes, * * *" and that the benefit therein does not cover "* * * death resulting from any violation of law* * *."

The decisive question in this case is two-fold: (1) Did insured's death result from any violation of law; and (2)

if so, was it such as was contemplated by the parties to the insurance contract as an excepted risk?

About six o'clock in the evening of November 30, 1940, insured was riding on a motorcycle in the direction of Peterstown, West Virginia, on the public highway in Giles County, Virginia, between Rich Creek, Virginia, and the Virginia-West Virginia line. Inez Suttle, a neighbor girl, fifteen years of age, was seated on the motorcycle behind insured. As the result of a collision between an automobile being driven in the opposite direction by one Gwinn, insured was killed. Gwinn's wife and children were with him in the car. The collision occurred after dark on a dry macadam road, where the road had about an eighteen-foot width and a descending grade of two and one-half per cent in the direction the automobile was traveling. To the right of the paved road in the direction of Peterstown there was an earth berm, varying from 6 feet to 7.3 feet, and a berm about eight feet wide on the opposite side at the point of the collision. The road was straight in the direction of Peterstown for a distance of three hundred and forty-five feet and seven hundred and ninety feet toward Rich Creek.

The testimony of the eyewitnesses bearing on the question of how the collision occurred conflicts sharply. Inez Suttle testified that the motorcycle was being driven about forty miles an hour; that, though dark, she saw it was being propelled to the right of the white center line; and that Gwinn's car, headed toward Rich Creek, was being driven on the wrong side of the road and into the motorcycle. To the contrary, Gwinn testified that while he was proceeding with his wife and children along the road in the direction of Rich Creek, at a speed of about thirty-five miles an hour, insured's motorcycle, coming at a high rate of speed on the wrong side and in the opposite direction, caused him to swerve so that the right wheels of his automobile were three feet on the berm, struck his car, broke off the left front wheel and headlight, and rendered ineffectual the foot-brakes. He further testified that because of the grade of the road and the loss of his left front wheel his car swerved to the left and

onto the opposite side of the road. Mrs. H. E. Davis testified that she was standing on her porch a short distance away, and had a full view of the accident; that the motorcycle was being driven at a high rate of speed; and that from the headlights she saw it was on the wrong side of the road. Mrs. Gwinn, who was ill at the time of the trial, did not testify, and the Gwinn children were too young to be of any avail.

Defendant's counsel says that the record discloses undisputed "physical" facts sufficient to override any reasonable inferences which may be drawn in plaintiff's favor from the testimony of the eyewitnesses. Several witnesses, including a Virginia state police officer, Stoutamyer, whose statement was taken in lieu of testimony, stated without contradiction that immediately after the accident both vehicles came to rest on the left side of the center line looking toward Rich Creek. Gwinn testified that after the collision, he observed "There was a sort of a digging in the hard surface where my wheel was knocked off that the car did and also a digging from this point to where the motor-cycle stopped." Stoutamyer stated that he visited the scene of the accident about a half hour after it occurred; that "The automobile was at rest on left hand side of road looking towards Rich Creek, and marks on the pavement ran from its location back towards Peterstown obliquely across the road to a point about two and one-half feet from the edge of the hard surface on the left hand side looking towards Peterstown."; and that he noticed dirt on the pavement about two feet from the edge on the left hand side looking toward Peterstown, and the marks apparently from an automobile tire and about three feet off the hard surface and on the berm of the road.

The witness Ballard testified that he visited the scene shortly after the accident and observed that "There was a mark, a single mark, leading from over on the left hand side of the white line over to the motorcycle, over to where the motor-cycle was, and there was another mark, and these marks were indented into the hard surface of the road, leading in a kind of circular fashion over to where the automobile was on the right hand side of the

white line," and further that the two marks led from the motorcycle and automobile, respectively, back to the same point, which point was on the right side of the white line looking toward Rich Creek.

Linville Rowe, who accompanied Ballard to the scene of the accident, on direct examination, substantially corroborated Ballard but, on cross-examination, he testified that the marks that he saw were on the right hand side of the road looking toward Rich Creek, and that there were no marks on the right hand side of the road going from Rich Creek to Peterstown "that I saw."

Plaintiff's counsel say that Rowe's testimony conflicts with that of Stoutamyer, Ballard and Gwinn. It is asserted strongly that, because Rowe saw no marks on the right side of the road in the direction in which the motorcycle was running, the jury had a right to say none was there. It is further asserted that because this witness saw no dirt on the road or tire marks on the berm, as Stoutamyer stated, the jury could infer also that Stoutamyer's statement in that regard and Gwinn's testimony that he drove his car onto the berm on his right are untrue. This, in all deference to counsel, does not follow. The evidence discloses that all witnesses who testified to the position of the vehicles at rest and the marks on the road and berm viewed the scene after dark. Under these circumstances the fact that a witness fails to see marks on the berm is of little moment. Of course, negative evidence is entitled to jury consideration, but such evidence does not necessarily conflict with the positive testimony of disinterested witnesses. The fact that Rowe noticed no marks on the left of the center line in the direction of Rich Creek does not prove that none was there. But if, as he testified, he saw marks to the right of the center line, in the direction the automobile was traveling, that is a clear indication that the point of collision was on that side of the line, and is corroborative of the testimony of defendant's witnesses that insured was on the wrong side of the road, in which event insured was then and there driving his motorcycle in violation of Title 18, Chapter 90B, Article III, Sections

115 and 112, Virginia Code, (Michie's Code, 1936, Sections 2154 [115] and 2154 [112]), which read, respectively:

> "Drivers of vehicles proceeding in opposite directions shall pass each other to the right, each giving to the other, as nearly as possible, one-half of the main traveled portion of the roadway."
>
> "Except as otherwise provided in section 115, upon all highways of sufficient width the driver of a vehicle shall drive the same upon the right half of the highway, unless it is impracticable to travel on such side of the highway and except when overtaking and passing another vehicle subject to the limitations applicable in overtaking and passing set forth in sections 117 and 119."

Under these circumstances, the trial court was not justified in submitting to the jury the question whether insured's death was the result of a law violation. This record shows that the testimony of defendant's eyewitnesses is so clearly supported by the position of the vehicles after the accident and the marks on the road that it must be taken as true. The question, therefore, follows whether the violation of the statute is such as is contemplated by the policy.

As before noted, defendant is a fraternal benefit society incorporated under the laws of Nebraska; and by the terms of the policy the "Articles of Incorporation, the Constitution, Laws and By-Laws of the Society" are expressly made a part of the contract. The construction and validity thereof would depend upon the judicial determinations, if any, of the Nebraska court, (11 Am. Jur. 450; Beale, Conflict of Laws, Vol. Three, pages 1211 and 1212) but we are not cited to, nor have we found, any decisions in that jurisdiction interpreting a clause in an insurance policy similar to the one now under consideration here. We are therefore free to construe the language of the policy in the light of decisions by this Court.

Provisions in policies of insurance which preclude recovery in case of death while engaged in a violation of law have been held to be enforceable. 29 Am. Jur. 692. In *Lamb* v. *Liberty Life Ins. Co.,* 129 Kans. 234, 282 P. 699, 701,

it was said that "The purpose of the provision exempting an insurance company from liability for loss sustained while the insured is violating the law is not only to discourage violation of law, but to eliminate the extra hazard which comes from the violation thereof."

In this jurisdiction the insurer has not been relieved of liability where death has resulted from a violation of law, if it "was comparatively trivial and was not such as in the ordinary course of events might reasonably be expected to be attended with fatal consequences." *Patton* v. *Kansas City Life Ins. Co.*, 115 W. Va. 40, 175 S. E. 334; *Martin* v. *Insurance Co.*, 106 W. Va. 533, 146 S. E. 53. *A fortiori*, where the consequences might reasonably be expected, the violation of law has been characterized as an excepted risk. In *Bloom* v. *Franklin Life Ins Co.*, 97 Ind. 478, 49 Am. Rep. 469, death of the insured resulted while he committed an assault and battery, and the court, speaking of the violation of law, said: "It is enough if the act is unlawful in itself, and the consequences flowing from it are such as might have been reasonably expected to happen, for, in such a case the ultimate result is traced back to the original cause." None of the cases cited above involved traffic violations, as did *Flannagan* v. *Insurance Co.*, 22 F. (2d) 136 (4th), and *Provident Life & Accident Ins. Co.* v. *Eaton*, 84 F. (2d) 528 (4th), wherein it was determined that driving an automobile in violation of a state statute came within the provisions of the policy, under which no liability could be claimed. We are cited to the case of *Mutual Life Ins. Co. of New York* v. *Grimsley*, 160 Va. 325, 168 S. E. 329, 331, where the Supreme Court of Appeals of Virginia disapproved an instruction which told the jury that if "insured inadvertently and involuntarily drove his car upon the left hand side of the road, he may have been guilty of negligence, but was not guilty of violation of law in so doing." That case, like the instant one, was concerned with the question of whether driving on the wrong side of the highway was a violation of law within the meaning of the policy upon which action had been brought. The opinion in the *Grimsley* case does not disclose the reasoning upon which the Virginia court based

its conclusion. Applying the reasoning which this Court adopted in denying liability in the *Patton* and *Martin* cases, *supra,* we are of opinion that the violation of law in the instant case is "such as in the ordinary course of events might reasonably be expected to be attended with fatal consequences." A driver of a motor vehicle operating it upon the public highway must know, as Collins certainly knew, that while a motorcycle is not *per se* a dangerous instrumentality, it may become such when it is operated in disregard of the rights of drivers of other motor vehicles rightfully upon the highway. When Collins drove upon the left side of the highway, he was bound to anticipate the presence of other vehicles approaching from the direction in which he was driving and upon their proper place upon the paved road. Upon a correct analysis of the evidence adduced and conclusion that the collision occurred on decedent's left side of the road, there is nothing in the record which in any wise reflects that insured's death occurred from anything other than his violation of the law. Certainly, where the record shows that Collins was driving his motorcycle at a speed of forty miles per hour, according to plaintiff's testimony, and could have seen an approaching vehicle for a distance of several hundred feet, yet did nothing to avoid the collision, the violation of law attributable to him continued to the very moment of impact and certainly can not be said to be trivial.

The conclusion we have reached must not be construed as holding that every violation of the traffic laws falls within the purview of the language found in the insurance contract. What we have herein determined is based upon the facts of the case as disclosed by the record before us.

For the foregoing reasons, the judgment of the trial court is reversed, the verdict set aside, and a new trial awarded.

*Judgment reversed; verdict set aside;*
*new trial awarded.*

LOVINS, JUDGE, dissenting:

I dissent from the conclusion reached by the majority for the following reasons:

The defense interposed by the insurer is an affirmative defense and it was necessary to establish the same. *Martin* v. *Insurance Co.*, 106 W. Va. 533, 540, 146 S. E. 53, and cases cited. I cannot say as a matter of law that this requirement was met by plaintiff in error.

I believe that this case can not be distinguished in principle from the cases of *Patton* v. *Kansas Life Ins. Co.*, 115 W. Va. 40, 175 S. E. 334, and *Martin* v. *Insurance Co.*, *supra*. The violation of law with reference to the use of a public road by a driver of a motor vehicle is certainly no more serious than one where a person engages in a fight with another. It can be said with reason that a person who assaults another may expect counter-measures of a dangerous nature from a determined adversary. An operator who uses the wrong side of a public road can not be said to anticipate death from such law violation any more than one who engages in personal combat with another, who is determined to resist.

The violation of law by Collins was trivial and, although followed by his death, was not such as could be expected to be followed by a fatal result. Collisions between motor vehicles do not always result in fatalities.

There was a sufficient conflict in the testimony so as to present a jury question. There was more than a so-called scintilla of evidence which showed that Collins was on the right side of the road at the time of the collision. The weight of the evidence and the credibility of the witnesses are questions within the province of the jury, and the jury having resolved those questions against the insurer, I would not set aside its finding.